UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flmb.uscourts.gov

In re:

GOODMAN AND DOMINGUEZ, INC.,

Debtor.

_____/

Case No. 17-17237-RAM

**EMERGENCY MOTION FOR ORDER APPOINTING A CHAPTER 11 TRUSTEE**
**(Emergency Hearing Requested)**

**Basis for Requested Emergency Hearing**

**Creditor Sandy's Discount Shoes Inc. requests an emergency hearing in this matter as soon as the Court's calendar permits in order to avoid the Debtors' continuing losses, to prevent further diminution of the value of the Debtors' estates, and to stabilize the Debtors' business operations. Pursuant to Local Rule 9075-1, counsel for Sandy's conferred with several creditor representatives in these chapter 11 cases, including Committee counsel, in order to resolve the issues herein.**

Pursuant to § 1104 of the Bankruptcy Code, Creditor Sandy's Discount Shoes Inc. d/b/a Sandy's Wholesale Shoe Division ("Sandy's") moves the Court (the "Motion") for the entry of an order appointing a chapter 11 trustee in the chapter 11 bankruptcy cases of Goodman Dominguez, Inc., Traffic, Inc., Traffic Las Plazas, Inc., and Traffic Plaza Del Norte, Inc. (collectively, the "Debtors"). In support of this Motion, Sandy's respectfully states as follows:

**JURISDICTION**

1.      The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 157 and 1334. Venue of this matter is proper under 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under to 28 U.S.C. § 157(b)(2)(A), (G), and (O).

**BACKGROUND**

1

**A.  The Original Chapter 11 Proceedings**

2.      On January 4, 2016 (the "Original Petition Date"), each of the Debtors filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Original Chapter 11 Proceedings").

3.      Sandy's was one of five members of the Official Committee of Unsecured Creditors (the "Committee") of the jointly administered chapter 11 cases of the Debtors appointed by the U.S. Trustee on January 26, 2016.

4.      Prior to the Original Petition Date (and throughout the progress of the Original Bankruptcy Proceedings), the Debtors were a closely-held business in the retail shoe industry. Goodman and Dominguez was and continues to be owned 70% by David Goodman and 30% by Ornella Goodman, while Traffic Inc. is owned *100%* by David Goodman.

5.      On November 4, 2016, the Debtors and the Committee jointly filed the *Plan Proponents' Second Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") [ECF No. 307].

6.      On that same date, the Debtors and the Committee filed the *Disclosure Statement for Plan Proponents' Second Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") [ECF No. 306].

7.      On December 28, 2016, the Court entered its *Order Confirming the Plan Proponents' Second Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, Dated November 4, 2016, as Amended* (the "Confirmation Order") [ECF No. 399].

8.      Critically, the Debtors' principals and insiders were responsible for providing to the Committee (and all creditors) the financial information and business plan that formed the basis of the projections attached as Exhibit "3" to the Disclosure Statement.

2

9.      In the *Confirmation Affidavit of David Goodman* (the "Confirmation Affidavit") [ECF 385], Goodman avers that he is responsible for the management and oversight of "*all* aspects of the operations and finances of the Debtors." Confirmation Affidavit, ¶ 3 (emphasis added).

10.      Indeed, on behalf of the Debtors, David Goodman vouched for the accuracy of the financial projections and business plan he developed when he approved the Disclosure Statement and signed the Confirmation Affidavit.

11.      The factual premises upon which the Plan was structured, and the Confirmation Order was entered, were substantiated by David Goodman, who "provided the information that was used to create the Financial Projections attached as Exhibit '3'" (the "Financial Projections"). Confirmation Affidavit, ¶ 30. A copy of the Financial Projections are attached hereto as Exhibit "A."  In the Confirmation Affidavit, David Goodman further stated that, "[a]s reflected in the Financial Projections, I believe the Debtors will have sufficient Cash Flow to make the required Class 3 Annual Minimum Distribution to the holders of Allowed Claims in Class 3 (General Unsecured Claims) during the multi-year term of the Plan." Confirmation Affidavit, ¶ 30.

**B. Post-Confirmation Failure of the Plan and Collapse of the Debtors' Financial Projections**

12.      Under the Plan, the Debtors were required to distribute to general unsecured creditors such creditors' *pro rata* share of a distribution totaling $1.25 million to be distributed in five installment payments spanning three years. Debtors were required to make the first installment payment under the Plan of $350,000.00 on February 16, 2017, and the second installment payment of $100,000.00 on March 18, 2017.   *See* Plan, Art. I.A(23); Art. I.A.(25) Art. III.B.

13.    Committee counsel contacted the Debtors multiple times in advance of the due date and was informed on February 16, 2017, that the Debtors would not make the initial installment payment due on February 16, 2017.

14.    At a status conference held by the Court on February 21, 2017, the Debtors stated to the Court that they did not make the initial installment payment because the Debtors' sales during January and February were significantly lower than projected, and therefore, the Reorganized Debtors had insufficient funds to make the initial $350,000 distribution. *See* Transcript of Hearing (2-21-2017), p. 4, at 11–15.

15.    The Debtors' own monthly operating reports filed contemporaneously with the Court's hearing to consider confirmation of the Plan demonstrate that the Debtors knew or should have known that their sales figures could not possibly have supported the statements and representations made in the financial projections set forth in the Debtors' Disclosure Statement.

16.    For example, the Debtors' Financial Projections represent that the Debtors anticipated sales, total expenses, and net income in the following amounts for 2017, 2018, 2019:

| Year | 2017 | 2018 | 2019 |
|---|---|---|---|
| **Annual Projected Sales** | $ 24,072,448 | $ 22,989,145 | $ 22,300,898 |
| **Total Expenses** | $ 23,210,745 | $ 22,594,315 | $ 22,241,867 |
| **Net Income** | $ 861,703 | $ 394,830 | $ 59,031 |

17.    Meanwhile, at or around the same time the Debtors and the Debtors insiders made the foregoing projections, the Debtors' own monthly operating reports for January 2017,

February 2017, and March 2017 demonstrate that the Debtors' Financial Projections were either completely inaccurate or misstated, or both:

| Month | January 2017 | February 2017 | March 2017 |
|---|---|---|---|
| Net Monthly Sales[1] | $ 1,122,523.44 | $ 1,358,936.38 | $1,542,471.47 |

18.    Averaging the monthly net sales set forth in the foregoing monthly operating reports, the projected yearly sales for the Debtors would be $16,095,725.16,[2] nearly $6 million dollars less than the sales figures set forth in the Debtors' Financial Projections.

19.    Debtors are in material default under the Plan because they failed timely to make the first two installment payments to the holders of allowed general unsecured claims in the combined amount of $450,000 (the "Installment Payments").

20.    The Plan also provided that David and Ornella Goodman and certain family members of the Debtors (the "Insiders") would retain their respective equity interests in the Reorganized Debtors without having to contribute *any* cash or assets for the receipt of such equity interest. In addition to retaining their equity interests in the Debtors, the Insiders are also receiving substantial "capped" annual salaries which total more than $2.35 million over the life of the Plan. *See* Plan, Art. V.M; Disclosure Statement, Section IV.I ("Capping of Certain Insider Salaries During the Term of the Plan").

21.    In addition to the complete collapse of the Debtors' Plan and the post-confirmation distribution rubric created by the Plan, administrative expenses and post-

---

[1] These figures constitute the composite sales figures for Goodman Dominguez, Inc., Traffic Las Plazas, Inc., and Traffic Plaza Del Norte, Inc.

[2] The average monthly sales for the above-enumerated months for Goodman Dominguez, Inc., Traffic Las Plazas, Inc., and Traffic Plaza Del Norte, Inc. is $1,341,310.43, which, when multiplied by 12 months, equals $16,095,725.16.

confirmation rent obligations of the Debtors in the Original Chapter 11 Proceedings continued to mount and compound with the Debtors' continued defaults under the Plan and the Debtors' post-confirmation obligations.

22.     For example, following the entry of the Confirmation Order, the following creditors filed motions for stay relief to collect payment of post-confirmation rents and to evict the Debtors from possession under certain non-residential real property leases assumed under the Plan:

  i. Simon Property Group, Inc. [ECF No. 454] (alleging post-confirmation rent owed of **$89,993.54**);

  ii. CBL & Associates Management, Inc. [ECF No. 458] (alleging post-confirmation rent owed of **$32,223.03**);

  iii. GGP Limited Partnership [ECF No. 461] (alleging post-confirmation rent owed of **$278,700.96**)[3];

  iv. Dolphin Mall Associates, LLC [ECF No. 472] (alleging post-confirmation rent owed of **$46,433.79**).

23.     The motions for relief from stay filed by these landlord creditors alone demonstrate that the Debtors, under the management and control of David Goodman, are in post-confirmation default under the respective assumed leases in a total amount of $**447,351.32**.

24.     Despite the Debtors' complete failure and their inability to comply with the most basic and integral provisions of the Plan, David Goodman continues to jointly operate and control each of the Debtors.

---

[3] This amount is extracted from the *Notice of Filing* filed by GCP Limited, which updated amounts set forth in its motion for stay relief.

25.     Compounding the issues created by the Debtors' blatantly misstated financial projections and the apparent conflict of interests among the Debtors' Insiders, the Debtors' month-to-month cash flows continue to severely underperform as compared to the Financial Projections which undergirded the Plan and Confirmation Order. The precipitous decline and/or underperformance of the Debtors' monthly sales figures has now created a Plan that was, in retrospect, infeasible *ab initio*.   The Debtors are now not only unable to fund the required payments to unsecured creditors, but to even pay the required rent on assumed leases, thereby creating a further crushing administrative claim burden that is unsustainable.

### C.  The (Reorganized) Debtors File Their Current Chapter 11 Proceedings

26.     Notwithstanding the reorganized Debtors' demonstrable failure to uphold their *basic* obligations under the confirmed Plan, and notwithstanding the dramatically inaccurate financial projections furnished by David Goodman, the reorganized Debtors, on June 9, 2017, have nonetheless filed their second voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Current Chapter 11 Proceedings").

27.     The Current Chapter 11 Proceedings were authorized and initiated by the Debtors' president, David Goodman.

### ARGUMENT

**I.      The Appointment of a Chapter 11 Trustee is Appropriate in the Current Chapter 11 Proceedings**

#### A.  Legal Standard

28.     Sandy's seeks entry of an order directing the appointment of a chapter 11 trustee in these Current Chapter 11 Proceedings because such an appointment is necessary to abate the compounding monthly flood of administrative obligations incurred by the Debtors' estates,

1381082v1 999107.0001

improve the prospects of a meaningful distribution to unsecured creditors in this case, and eliminate the extant conflicts of interest that exist between the Debtors' insiders, creditors, and bankruptcy estates.

29.     Under § 1112(b) of the Bankruptcy Code, the Court may appoint a chapter 11 trustee if the Court determines that appointment under § 1104 is a superior alternative to dismissal or conversion under § 1112. *See, e.g.*, 11 U.S.C. § 1112(b)(1). In turn, § 1104(a)(2) of the Bankruptcy Code provides that after notice and a hearing, a court "shall" order the appointment of a trustee "if such appointment is in the interests of creditors . . . and other interests of the estate, without regard to . . . the amount of assets or liabilities of the debtor." 11 U.S.C. § 1104(a)(2).

30.     The appointment of a chapter 11 trustee under this subsection does *not* require the Court to make a finding of "cause" as under § 1104(a)(1) and the Court may therefore appoint a trustee even if no cause exists. *See, e.g.*, *In re Soundview Elite, Ltd.*, 503 B.R. 571, 582 (Bankr. S.D.N.Y. 2014); *In re Ridgemour Meyer Properties, LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008); *In re Bergeron*, 13-02912, 2013 WL 5874571, at *9 (Bankr. E.D.N.C. Oct. 31, 2013).

31.     Courts construing this subsection "eschew rigid absolutes and look to the practical realities and necessities" of the record to determine whether the appointment of a trustee is in the best interests of the estate. *In re Adelphia Commc'ns Corp.,* 336 B.R. 610, 658 (Bankr.S.D.N.Y.2006). That is, the standard for appointment under § 1104(a)(2) is a flexible one that suggests a balancing of costs and benefits in determining whether the appointment of a trustee is appropriate. *In re Ionosphere Clubs, Inc*., 113 B.R. 164, 168 (Bankr.S.D.N.Y.1990); *In re SunCruz Casinos, LLC*, 298 B.R. 821, 829 (Bankr. S.D. Fla. 2003) (Hyman, J.). At bottom, §

8

1104(a)(2) "reflects the practical reality that a trustee is needed." *In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007).

32.     Courts analyzing the propriety of appointment under § 1104(a)(2) consider the debtor's past and present performance and prospects for rehabilitation, the confidence of the business community and creditors in the debtor's management, the existence of conflicts of interest, and the benefits to be derived from the appointment of a trustee balanced against the costs of appointment. *See In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010); *Euro-American*, 365 B.R. at 428; *Soundview Elite*, 503 B.R. at 583 (listing factors). A debtor's ability to meet administrative obligations is also a factor analyzed by the courts when considering the appointment of a chapter 11 trustee. *See Taub*, 427 B.R. at 227.

33.     As set forth in detail below, the practical considerations and reorganizational necessities in these cases demonstrate that the appointment of a chapter 11 trustee is the paramount remedy for these ailing chapter 11 cases.

**B. Sandy's Submits that the Benefits Derived By The Appointment of a Trustee *Clearly Outweigh the Costs of Appointment of a Trustee*.**

34.     The cost of another of Chapter 11 bankruptcy case run by the principals and insiders of the Debtors would cause substantial, irreparable harm to the Debtors' estates, employees, and creditors. Without the immediate appointment of a trustee, the Debtors' ongoing operations and business will fail, leading to a conversion to chapter 7 or dismissal of these Current Chapter 11 Proceedings. With this failure, the Debtors' numerous employees would be left stranded and without a job. The value of the Debtors' inventory would immediately be reduced to a pennies-on-the-dollar liquidation value. General unsecured creditors would receive *no* distributions from the Debtors' estates as the hemorrhaging of unpaid, rent-based administrative expenses mount. Finally, even those creditors fortunate enough to enjoy

administrative status in these Chapter 11 Cases would receive a distribution substantially less than they would if a Chapter 11 trustee were appointed.

35.     A chapter 11 trustee is necessary to provide oversight and to develop a strategy for the financial rehabilitation of the Debtors. *See In re Eurospark*, 424 B.R. at 632 (citation omitted) (stating that where the parties with the greatest economic stake in the case have lost confidence in management, the "need for a chapter 11 trustee . . . outweighs the cost of the appointment); *In re Euro-American Lodging*, 365 B.R. at 432. Such oversight will instill confidence in the creditors, which will save the estate substantial litigation costs. *See id.* at 177 ("[I]f a party is appointed in whom the creditors have confidence, they may be less confrontational and litigious and more willing to work with [the Debtor]."); *In re Microwave Products of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) (considering the fact that if a chapter 11 trustee is not appointed, "[b]ecause of the erosion of confidence in the debtor, there is likely to be increased litigation which will result in escalating legal costs to the estate").

36.     As juxtaposed to the likely consequences of dismissal or conversion, the benefit of a chapter 11 trustee in this cases is conspicuous: whereas the Debtors have previously failed to discharge the duty under the Plan and Bankruptcy Code, a chapter 11 trustee will seamlessly and immediately take over the full operations of the Debtors and objectively review and analyze the *actual* financials, performance, and profitability of the Debtors *without* the clouded bias of the Debtors' Insiders. Once the chapter 11 trustee has finalized this analysis, the trustee would have the ability to determine the best course of action for the Debtors.

37.     Sandy's respectfully submits that the benefits derived from the appointment of a chapter 11 trustee clearly outweigh the cost thereof.

### C.  The Loss of Creditor Confidence is a Sufficient Basis for the Appointment of a Chapter 11 Trustee

10

38.     Courts have emphasized the importance of management's ability to gather the confidence of its creditors post-petition, and have been quick to appoint a Chapter 11 trustee in circumstances where the debtor lacked credibility and failed to instill confidence.  *See, e.g., In re Tahkenitch Tree Farms P'ship*, 156 B.R. 525 (Bankr. E.D. La. 1993) (Even in absence of fraud and dishonesty a trustee should be appointed where a debtor's management cannot act as agent for debtor in fair and unbiased manner.); *Smith v. Concord Coal Corp. (In re Concord Coal Corp.)*, 11 B.R. 552 (Bankr. S.D. Va. 1981).  *See also Cardinal Indus., Inc.*, 109 B.R. at 765 (finding that "a serious and general loss of confidence in the Debtor's management … follow[ing] good faith efforts by the Creditors to permit the Debtors to direct their own reorganization" required the appointment of a trustee.).  The Insiders record of mismanagement, dishonesty, incompetence and mismanagement as overwhelmingly demonstrated in this Motion has justifiably caused the creditors to distrust management and its decisions on how to reorganize the Debtors. 1104.02[1], at 1104-6. *See also Marvel Entm't*, 140 F.3d at 473 (finding that a "deep seated conflict and animosity" between debtor and its lenders and creditors' lack of confidence in debtor's ability to act as fiduciary warranted the appointment of trustee).

39.     The final straw was the waste of the past year and a half while the Debtors misled the creditors of the estate in confirming a Plan that was doomed to fail from the moment it was confirmed.  That failure can be attributed to only one of the following two factors:  (i)  the Debtors intentionally misled the Court through the use of inaccurate data and projections or (ii) the management of the Debtors is so grossly incompetent that it could not project its own finances even weeks in advance.

40.     Sandy's believes that an independent trustee should be appointed to ensure that the business is operated without regard to insider interests and with the interests of the estate as a

11

whole so that a plan of reorganization fair to all constituents can finally be advanced and confirmed.  Accordingly, the appointment of an independent trustee is necessary to preserve the integrity of the reorganization process.  *See In re Bellevue Place Assocs.*, 171 B.R. 615, 624 (Bankr. N.D. Ill. 1994); see also *In re V. Savino Oil*, 99 B.R. at 527 n.11 (finding the appointment of trustee necessary "to insulate the reorganization process from paralytic conflict").

### D. The Debtors' Bleak Past and Present Performance and Prospects for Rehabilitation Warrant the Appointment of a Chapter 11 Trustee

41.  Debtors' past and present performance and prospects of rehabilitation warrant the appointment of a chapter 11 trustee in these Chapter 11 Cases.

42.  In the previous bankruptcy case, despite working ffor months with the Committee to formulate a plan, Debtors failed to fulfill their most basic obligations under the Plan just months after the Court entered its Confirmation Order.  The *sine qua non* of the Plan was the so-called "Class 3 Annual Minimum Distribution" whereby the Debtors were required to distribute to Sandy's and other general unsecured creditors a guaranteed minimum distribution totaling $1.25 million.  This distribution was the focal point of several months of negotiations between the Committee and the Debtors.  But, following confirmation of the Plan, the Debtors revealed that their projected sales upon which the Plan was predicated, were completely misstated and materially lower than projected.  As a result, the Debtors failed to make the required distribution to unsecured creditors, and conceded that such failure was directly attributable to the less-than-projected sales figures.

43.  Thereafter, the joint Plan—and any prospect of a successful reorganization thereunder—quickly deteriorated.  The Committee filed its *Motion of the Official Committee of Unsecured Creditors (I) To Enforce the Confirmation Order, Dated December 28, 2016 [ECF No. 399], or, in the Alternative, (II) to Undo the Effective Date of the Plan and to Convert the*

12

*Reorganized Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* (the "Motion to Convert") [ECF No. 422] seeking, *inter alia*, to convert the Chapter 11 Cases to liquidation cases under Chapter 7; Sandy's filed its *Motion for Order (I) Vacating the Confirmation Order, and (II) Appointing a Chapter 11 Trustee* [ECF No. 460]; Debtors filed *Debtors' Motion to Modify Second Amended Plan of Reorganization* [ECF No. 484]; and multiple landlords filed motions for relief from stay and/or for an order compelling the Debtors to pay post-confirmation rent [ECF Nos. 454, 458, 461 & 472].

44.    In light of the Debtors' complete failure to perform its basic obligations under the previous Plan, it is now clear that if these Debtors are going to continue in business and produce *any* distribution to creditors, the appointment of an independent operating trustee is needed. Debtors' losses and administrative obligations will only continue to mount each month. With each passing month, the Debtors continue towards administrative insolvency and the inevitable conclusion that general unsecured claims will not receive *any* distribution in these Chapter 11 Cases.

45.    The  appointment of a chapter 11 trustee is necessary to improve the Debtors' performance. This result is especially warranted here in light of the Debtors' "inability to formulate a business plan and make operating projections which have a longevity of more than several months, along with the continuing enormous operating losses being sustained by the estate[s]." *See In re Ionosphere,* 113 B.R. at 170 (appointing trustee under (a)(2) due to failure to formulate viable business plan and along with continued enormous operating losses); *In re Evans,* 48 B.R. 46, 49 (Bankr. W.D. Tex. 1985) (appointing trustee under (a)(2) where historic poor performance provides little or no evidence that the debtor is capable of a successful reorganization); *In re Cardinal Industries, Inc.,* 109 B.R. 755 (Bankr. S.D. Ohio 1990)

(appointing chapter 11 trustee where debtors presented inaccurate financial forecasts, failed to stem cash losses since the bankruptcy filing, and were infected with conflicts of interest).

**E. The Appointment of a Chapter 11 Trustee is Necessary to Prevent the Further Accumulation of Administrative Expenses.**

46.    In the Original Chapter 11 Proceedings, the post-confirmation Debtors simply could not pay rents under assumed leases as such rents became due. As noted *supra*, just months after the Court confirmed the Plan in the Original Chapter 11 Proceedings, four creditors in the Original Chapter 11 Proceedings filed motions for stay relief indicating post-confirmation rent defaults in the amount of at least $**447,351.32**. Further, the Debtors also have not, and could not, pay the administrative professional claims that amassed during the Original Chapter 11 Proceedings.

47.    Within the context of these Current Chapter 11 Proceedings, the foregoing continuing abrogation of the Debtors' lease obligations and inability to pay professionals constitutes strong indicia that the *same* Debtors that are suffering from the *same* diminution in income will be unable to pay administrative expenses in these Current Chapter 11 Proceedings. Bankruptcy courts have held that a "debtor's inability to meet [its] administrative obligations, including the regular payment of the administrative expense of a case, is also a factor to be considered in deciding whether a trustee should be appointed." *Taub*, 427 B.R. at 229.

48.    Here, as in *Taub*, the appointment of a trustee is necessary to prevent the likely— if not guaranteed—accumulation of administrative expenses to the Debtors' estates. At a minimum, a chapter 11 trustee would be able, and better suited, to negotiate with the Debtors' landlords—the main source of the Debtors' administrative expense obligations.

**F. The Existence of an Inherent Conflict of Interest Among the Debtor, the Debtors' Management and Insiders, and the Debtors' Creditors Warrants the Appointment of a Chapter 11 Trustee**

14

49.     Permitting David Goodman and other Insiders to continue to exercise control over the Debtors within these Current Chapter 11 Proceedings is fundamentally incompatible with the duties and responsibilities of the Debtors as debtors-in-possession.

50.     "The debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization." Marvel, 140 F.3d at 471; In re Bellvue Place Assoc., 171 B.R. 615, 624 (Bankr. N.D.Ill. 1994) (providing that "a fiduciary -- the debtor in possession - is proscribed from acting solely in its self-interest to the exclusion of the other interest which the debtor in possession has the fiduciary obligation to protect."). These fiduciary duties operate to preclude directors and other officers—like David Goodman here—from "using their position of trust and control . . . to further their own private interest, either by usurping opportunities, holding undisclosed conflicts, or otherwise exploiting their position." *SunCruz*, 298 B.R. at 830 (*quoting Microwave Products,* 102 B.R. at 672). It is well established that when there is acrimony or a conflict of interest among creditors a proper remedy is the appointment of a trustee. *E.g.*, *In re Marvel Entm't Grp.*, 140 F.3d 463, 473–74 (3d Cir. 1998); *Taub*, 427 B.R. at 227. The Court may consider a conflict of interest in a debtor-in-possession when its own interests, such as equity ownership considerations, diverge from the estate's interests, thereby preventing the debtor-in-possession from fulfilling its fiduciary duty. *In re Eurospark Indus., Inc.*, 424 B.R. 621, 630 (Bankr. E.D.N.Y. 2010) (finding that an insider's direct conflict of interest preventing him from fulfilling his fiduciary duty to creditors warranted the appointment of a chapter 11 trustee).

51.     Sandy's submits that the appointment of a chapter 11 trustee is appropriate to resolve material conflicts of interest present among the Debtors' management and insiders.

Within the context of the Original Chapter 11 Proceedings, David Goodman retained primary ownership and control following the effective date of the Plan. David Goodman and other Insiders, through the Plan, retained their equity interests in the Debtors despite not having made *any* contribution for such equity interests. In retaining such equity interest in the Debtors, the Insiders also retained a pecuniary interest in the value of the Debtors' unencumbered assets—*i.e.*, the Debtors inventory which is projected to average between $7.3 million to $7.8 million per year. *See* Disclosure Statement, Exh. 3 (Projections).  The Plan and Disclosure Statement further provided that the Insiders would enjoy generous gross annual salaries of $2,358,830.24 during the four-year term of the Plan, which amount equals roughly 5.25 times the amount of the $450,000 installment payments that are currently due.

52.    David Goodman and other Insiders of the Debtors retained primary control and ownership of the Debtors within the Original Chapter 11 Proceedings despite the concomitant failure of the post-confirmation, reorganized Debtors to meet their most basic obligations under the Plan. As was clear by the Disclosure Statement and the Confirmation Affidavit, David Goodman was "responsible for the management and oversight of *all* aspects of the operations and finances of the Debtors," including the provision of financial data upon which the Plan and Disclosure Statement were predicated. Now, through the Current Chapter 11 Proceedings, David Goodman ostensibly seeks to retain responsibility for the management and oversight of all aspects of the operations and finances of the Debtors notwithstanding the Debtors' (and his) abysmal performance during the Original Chapter 11 Proceedings. Allowing David Goodman (and other Insiders) to maintain the lucrative benefits of controlling and operating the Debtors within these Current Chapter 11 Proceedings despite the demonstrable failure that his management and control yielded during the Original Chapter 11 Proceedings is to allow David

Goodman (and other Insiders) to act in a manner which could damage the estate, or hinder a successful reorganization in these presently pending Current Chapter 11 Proceedings.

**WHEREFORE**, Sandy's respectfully requests that this Court enter an Order (a) appointing a chapter 11 trustee in these Chapter 11 cases pursuant to section 1104(a)(2) of the Bankruptcy Code to manage the ongoing business affairs of the Debtors, and (b) granting such other relief as this Court deems just and proper.

Dated: June 9, 2017.

Respectfully Submitted,
**TRIPP SCOTT, P.A.**
*Counsel for Sandy's Discount Shoes Inc.*
*d/b/a Sandy's Wholesale Shoe Division*
110 S.E. 6th Street, 15th Floor
Fort Lauderdale, FL 33301
Telephone:  954-525-7500
Facsimile:  954-761-7500

By:     /s/ *Kristopher E. Aungst*
Kristopher E. Aungst
*Florida Bar No. 0055348*
kea@trippscott.com
Angelo Castaldi, Esq.
Florida Bar No. 0119098
axm@trippscott.com
Jesse R. Cloyd
*Florida Bar No. 0058388*
jrc@trippscott.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 9, 2017, I electronically filed the foregoing document with the Clerk of the Court using *CM/ECF*.  I also certify that the foregoing document is being served this day via transmission of Notice of Electronic Filing generated by *CM/ECF* on all counsel of record or *pro se* parties who are authorized to receive electronically Notices of Electronic Filing in this bankruptcy case.

/s/  *Kristopher E. Aungst*
Kristopher E. Aungst

**EXHIBIT "A"**

**FINANCIAL PROJECTIONS**

1381082v1 999107.0001

**Goodman and Dominguez, Inc., et al (d/b/a Traffic)**
**Case No. 16-10056 (Jointly Administered)**
**United States Bankruptcy Court**
**Southern District of Florida**
**Miami Division**

### Annual Projections - Assumed Effective Date December 15, 2016

Source: Data provided by Debtor.

| Category | Notes | Effective Date Payments | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Sales | 2 | | $ 24,072,448 | $ 22,989,145 | $ 22,300,898 | $ 69,362,491 |
| | | | | | | |
| **Expenses:** | | | | | | |
| Banking Expense | 3 | | 433,304 | 413,805 | 401,416 | 1,248,525 |
| Marketing Expense | 4 | | 181,110 | 181,760 | 181,760 | 544,629 |
| Inventory Purchases | 5 | | 7,835,582 | 7,482,967 | 7,258,942 | 22,577,491 |
| Operating lease | 6 | | 22,800 | 22,800 | 22,800 | 68,400 |
| Transportation & Freight Out | 7 | | 868,545 | 881,138 | 881,138 | 2,630,820 |
| Computer Expenses | 8 | | 31,352 | 31,352 | 31,352 | 94,056 |
| Parking & Tolls | 8 | | 24,434 | 24,462 | 24,462 | 73,358 |
| Equipment Rental | 8 | | 7,800 | 7,800 | 7,800 | 23,400 |
| Insurance | 8 | | 767,677 | 767,677 | 767,677 | 2,303,030 |
| License and Permits | 8 | | 11,700 | 11,700 | 11,700 | 35,100 |
| Cash (under)/over | 9 | | 23,461 | 22,757 | 22,075 | 68,293 |
| Payroll Expenses | 10 | | 6,018,112 | 5,724,297 | 5,552,924 | 17,295,333 |
| Payroll Taxes | 11 | | 481,449 | 457,944 | 444,234 | 1,383,627 |
| Postage and Delivery | 8 | | 30,000 | 30,000 | 30,000 | 90,000 |
| Professional Fees | 8 | | 20,000 | 20,000 | 20,000 | 60,000 |
| Services | 8 | | 213,901 | 213,901 | 213,901 | 641,704 |
| Rent - Real-estate leases | 12 | | 4,953,902 | 5,020,515 | 5,095,119 | 15,069,536 |
| Storage Expense | 8 | | 397,800 | 397,800 | 397,800 | 1,193,400 |
| Repairs & Maintenance | 8 | | 203,400 | 203,400 | 203,400 | 610,200 |
| Security Expense | 8 | | 19,572 | 19,572 | 19,572 | 58,716 |
| Supplies Expense | 8 | | 135,600 | 135,600 | 135,600 | 406,800 |
| U.S Trustee qtrly fees | 13 | | 12,025 | 5,850 | 975 | 18,850 |
| Travel/Air | 8 | | 68,000 | 68,000 | 68,000 | 204,000 |
| Utilities | 8 | | 449,220 | 449,220 | 449,220 | 1,347,660 |
| **Total Expenses** | | | 23,210,745 | 22,594,315 | 22,241,867 | 68,046,927 |
| | | | | | | |
| **Net Income** | | | $ 861,703 | $ 394,830 | $ 59,031 | $ 1,315,564 |
| | | | | | | |
| **Estimated beginning cash** | | $ 1,267,811 | $ 280,950 | $ 246,797 | $ 218,753 | $ 1,267,811 |
| | | | | | | |
| **Net Cash flow (outflow) from operations** | | | 861,703 | 394,830 | 59,031 | 1,315,564 |
| | | | | | | |
| **Estimated Creditor Payments:** | | | | | | |
| Secured claim | 14 | (36,491) | (72,982) | - | - | (109,473) |
| Administrative 503(b)(9) claims | 14 | (45,844) | | - | - | (45,844) |
| Administrative professional holdbacks | 14 | (125,000) | | - | - | (125,000) |
| Administrative rent claims | 14 | (10,799) | | - | - | (10,799) |
| Priority 507(a)(2) rent claims | 14 | (48,931) | | - | - | (48,931) |
| Priority 507(a)(8) tax claims | 14 | (296,923) | | - | - | (296,923) |
| Admin 503(b)(9) | 15 | (72,874) | (72,874) | (72,874) | (72,874) | (291,495) |
| General Unsecured Creditors | 16 | (350,000) | (350,000) | (350,000) | (200,000) | (1,250,000) |
| | | (986,861) | (495,856) | (422,874) | (272,874) | (2,178,464) |
| | | | | | | |
| **Working capital reserve** | 17 | | (400,000) | | | (400,000) |
| | | | | | | |
| **Ending cash excluding working capital reserve** | 17 | $ 280,950 | $ 246,797 | $ 218,753 | $ 4,911 | $ 4,911 |

**Goodman and Dominguez, Inc., et al (d/b/a Traffic)**
**Case No. 16-10056 (Jointly Administered)**
**United States Bankruptcy Court**
**Southern District of Florida**
**Miami Division**

### Annual Projections - Assumed Effective Date December 15, 2016

Source: Data provided by Debtor.

#### Estimated Distribution to Creditors (Note 1)

| Claim Category: | Notes | | Claim Amount | Distribution Amount | % of Claim Paid | |
|---|---|---|---|---|---|---|
| Secured | 18 | | 109,473 | 109,473 | 100.0% | |
| Admin 503(b)(9) | | | 337,339 | 337,339 | 100.0% | |
| Admin – rent | | | 10,799 | 10,799 | 100.0% | |
| Admin - professional fee holdbacks | | | 125,000 | 125,000 | 100.0% | |
| Priority 507(a)(2) rent | | | 48,931 | 48,931 | 100.0% | |
| Priority 507(a)(8) tax | | | 296,923 | 296,923 | 100.0% | |
| **Total Admin and Priority** | | | 928,464 | 928,464 | 100.0% | |
| | | | | | | |
| **General Unsecured Claims** | | | 4,652,371 | 1,250,000 | 26.9% | |
| | | | | | | |
| **Total** | | | $ 5,580,835 | $ 2,178,464 | | |

*See Significant Notes and Assumptions*

**Goodman and Dominguez, Inc., et al (d/b/a Traffic)**
**Case No. 16-10056 (Jointly Administered)**
**United States Bankruptcy Court**
**Southern District of Florida**
**Miami Division**

### Notes and Assumptions to Projections

1) These amounts are based on the Debtors' reasonable information and belief as to the ultimate amount of the allowed creditor claims.

2) Based on Management's experience with industry trends, projected revenues are expected to decline 1.9% from 2016 to 2017, 4.5% from 2017 to 2018 and 3% for 2018 to 2019.

3) Banking expense is estimated to be approximately 1.8% of sales based on historical trends.

4) Marketing expense is projected to remain static through 2019.

5) Inventory Purchases are projected to be 32.55% of sales based on historical trends. Inventory purchases have been reduced by $350,000 in 2016 to account for inventory purchased in August and September, 2016 which will be sold during the holiday season.

6) Monthly operating lease is $1,900 or $22,800 annually.

7) Transportation and freight expense is expected to remain flat to account for increasing fuel costs.

8) Management anticipates these expenses will remain static though 2019.

9) The cash over and short account is used to record the difference between the expected cash balance and the actual cash balance in the imprest account. Amounts are derived from historical trends.

10) Management projects payroll expense to decline from 28.88% of sales in 2016 to 25.0% of sales in 2017 and to 24.9% of sales in 2018 and 2019.

11) Management projects payroll taxes to be 8% of payroll expense based on historical trends.

12) Rent amounts are pro-rated where applicable and derived from leases, amendments or schedules provided by the Debtors. It is assumed that when a lease terminates prior to 2019, the final annual rent amount was utilized for the subsequent years. CAM and other fees are assumed to increase by 3% annually.

13) The projections include an estimate for United States Trustee fees based on the statutory rates imposed on the amount of funds paid to the creditors.

14) Pursuant to the Chapter 11 Plan, it is anticipated that these payments will be made within thirty days of the Effective Date.

15) Certain 503(b)(9) claims in the amount of $291,495 will be paid out over a period of four years.

16) Pursuant to the Chapter 11 Plan, the Debtors will make payments to the general unsecured creditors totaling $1,250,000 of which $350,000 will be paid within thirty days of the Effective Date, $100,000 will be paid within sixty days of the Effective Date, $250,000 will be distributed during 2017, $350,000 will be distributed during 2018 and $200,000 will be distributed during 2019.

17) The Debtors have reserved $400,000 for working capital needs.

18) Pursuant to negotiations between the Debtors and Citibank, N.A., the Reorganized Debtors intend to pay the entire amount of the Citibank Secured Claim within the first three month period after the Effective Date.